# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2017 Term

_____

No. 15-0878

_____

**FILED**
**January 19, 2017**
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent**

**V.**

**RASHAUN R. BOYD,**
**Defendant Below, Petitioner**

_____

**Appeal from the Circuit Court of Berkeley County**
**Honorable Michael D. Lorensen, Judge**
**Criminal Action No. 14-F-45**

**AFFIRMED**
_____

**AND**

_____

No. 15-0894

_____

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent,**

**V.**

**CHRISTOPHER R. WYCHE,**
Defendant Below, Petitioner.

_____

Appeal from the Circuit Court of Berkeley County
Honorable Michael D. Lorensen, Judge
Criminal Action No. 14-F-48

**AFFIRMED**
_____

Submitted:  January 10, 2017
Filed:  January 19, 2017

**Jason D. Parmer**
**Public Defender Services**
**Charleston, West Virginia**
**Attorney for the Petitioner,**
**Rashaun R. Boyd**

**Kimberley D. Crockett**
**Falling Waters, West Virginia**
**Attorney for the Petitioner,**
**Christopher R. Wyche**

**Cheryl K. Saville**
**Berkeley County Assistant**
**Prosecuting Attorney**
**Martinsburg, West Virginia**
**Attorney for the Respondent**

**JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1. "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus point 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

2. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syllabus point 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

3. This Court will not reverse a denial of a motion to sever properly joined defendants unless the appellant demonstrates an abuse of discretion resulting in clear prejudice.

4. Under Rule 14(b) of the West Virginia Rules of Criminal Procedure, if the joinder of defendants for trial appears to prejudice a defendant or the State, the court has discretion to sever the defendants' trials or provide whatever other relief that justice requires.

5. A trial court should grant a severance under Rule 14(b) of the West Virginia Rules of Criminal Procedure only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.

6. "Upon review, this Court will afford great weight to a trial court's findings as to whether a peremptory strike was used to advance racial or sexual discrimination." Syllabus point 4, *Parham v. Horace Mann Insurance Co.*, 200 W. Va. 609, 490 S.E.2d 696 (1997).

7.     We review jury selection under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), *de novo*, but we review underlying factual findings for clear error.  We review the trial court's ultimate disposition for abuse of discretion.

8.     "When an object or article has passed through several hands while being analyzed or examined before being produced in court, it is not possible to establish its identity by a single witness, but if a complete chain of evidence is established, tracing the possession of the object or article to the final custodian, it may be properly introduced in evidence."  Syllabus point 2, *State v. Charlot*, 157 W. Va. 994, 206 S.E.2d 908 (1974).

9.     "There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial."  Syllabus point 2, *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007).

10.     "The question as to which witnesses may be exempt from a sequestration of witnesses ordered by the court lies within the discretion of the trial court,

and unless the trial court acts arbitrarily to the prejudice of the rights of the defendant the exercise of such discretion will not be disturbed on appeal." Syllabus point 4, *State v. Wilson*, 157 W. Va. 1036, 207 S.E.2d 174 (1974).

11.     "Several basic rules exist as to cross-examination of a witness. The first is that the scope of cross-examination is coextensive with, and limited by, the material evidence given on direct examination. The second is that a witness may also be cross-examined about matters affecting his credibility. The term 'credibility' includes the interest and bias of the witness, inconsistent statements made by the witness and to a certain extent the witness' character. The third rule is that the trial judge has discretion as to the extent of cross-examination." Syllabus point 4, *State v. Richey*, 171 W. Va. 342, 298 S.E.2d 879 (1982).

12.     A trial court's ruling on authenticity of evidence under Rule 901(a) of the West Virginia Rules of Evidence will not be disturbed on appeal unless there has been an abuse of discretion.

**Davis, Justice:**

This opinion involves two consolidated criminal appeals from final orders entered by the Circuit Court of Berkeley County. The petitioners in this matter were prosecuted in a joint trial. In Case No. 15-0878, the petitioner, Rashaun R. Boyd ("Mr. Boyd"), was convicted of attempted murder,[1] wanton endangerment[2] and possession of a firearm.[3] In this appeal, Mr. Boyd contends that the evidence was insufficient to sustain his convictions, and that this Court's standard of review set out in Syllabus point 3 of *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995), should be overruled. In Case No. 15-0894, the petitioner, Christopher R. Wyche ("Mr. Wyche"), was convicted of voluntary manslaughter,[4] wanton endangerment[5] and possession of a firearm.[6] In this appeal, Mr. Wyche contends that (1) the evidence was insufficient to sustain his convictions, (2) his trial

---

[1]Mr. Boyd was sentenced to three to fifteen years imprisonment for this conviction.

[2]Mr. Boyd was sentenced to five years imprisonment for this conviction, which was enhanced by an additional five years imprisonment based upon a recidivist charge and conviction.

[3]Mr. Boyd was sentenced to five years imprisonment for this conviction. Mr. Boyd's sentences were ordered to run consecutively.

[4]Mr. Wyche was sentenced to fifteen years imprisonment for this conviction.

[5]Mr. Wyche was sentenced to five years imprisonment for this conviction, which was enhanced by an additional five years imprisonment based upon a recidivist charge and conviction.

[6]Mr. Wyche was sentenced to five years imprisonment for this conviction. Mr. Wyche's sentences were ordered to run consecutively.

should have been severed, (3) the State impermissibly struck a juror, (4) evidence of gunshot residue should have been excluded, (5) the State disclosed certain evidence late, (6) a testifying police officer was permitted to sit at the State's table, (7) he was not permitted to ask certain questions about an investigating officer, (8) evidence of a dashcam video was improperly admitted, (9) the State made impermissible comments during closing argument, and (10) fingerprint records were improperly admitted. After carefully reviewing the briefs, the arguments of the parties, the legal authority cited, and the record presented for consideration, we affirm the final judgments in these consolidated appeals.

# I.

## FACTUAL AND PROCEDURAL HISTORY

The events leading to the prosecutions in this case began during the early morning hours of September 16, 2012, in the parking lot of a nightclub called Brickhouse Bar, in Martinsburg, West Virginia.[7] At that time, the victims in this case, Antoine Stokes and Samson Edmond, left the nightclub and were walking toward their car when Mr. Edmond complimented a passing woman about her visible tattoos.[8] The woman, Sierra

---

[7]There was testimony at trial that the relevant events began somewhere between 2:20 am and 2:40 am.

[8]It appears that Mr. Stokes and Mr. Edmond came to the nightclub together in Mr. Stokes' car.

2

Frisbee, smiled and continued walking with her friend, Tamara Burnett, toward a Cadillac.[9] The petitioners were standing near the Cadillac.[10] The Cadillac belonged to Mr. Boyd.

The record indicates that after Mr. Boyd gave Ms. Burnett the car keys and told her to drive, he yelled profanity at Mr. Edmond because of his comment to Ms. Frisbee about her tattoos. Mr. Boyd rushed toward Mr. Edmond and punched him. The two men started to fight. Mr. Stokes joined in the fight and struck Mr. Boyd. During the fight, Mr. Stokes noticed Mr. Wyche move away from the Cadillac, but lost sight of him. After two gunshots were fired, Mr. Stokes and Mr. Edmond retreated from the fight. As the two men ran away, more gunshots were fired. Mr. Edmond yelled out that he was hit. Mr. Stokes dragged Mr. Edmond behind a vehicle before running for safety behind the nightclub.

After the shooting stopped, the petitioners jumped into the backseat of the Cadillac, and Ms. Burnett drove away. Mr. Stokes went to the aid of Mr. Edmond and dialed 911 on his cell phone. When the police arrived, Mr. Stokes provided a description of the petitioners and the car they drove off in. Mr. Edmond was taken to a hospital where he was

---

[9]Ms. Frisbee and Ms. Burnett came to the nightclub together in Ms. Frisbee's car. It appears that Ms. Frisbee lost her car keys while at the nightclub. Mr. Boyd knew Ms. Frisbee and offered to let them ride with him.

[10]An apparent acquaintance of the petitioners, Jimmy Vick, was passed out in the backseat of the car.

pronounced dead from a single bullet that entered the left side of his neck and severed two arteries as it existed through his shoulder.

Ms. Burnett drove into Maryland. Based upon information circulated by West Virginia law enforcement authorities, a Maryland State Police officer spotted the Cadillac driven by Ms. Burnett and turned on his siren and lights. Mr. Boyd told Ms. Burnett not to stop, but she pulled over and stopped the car. As Ms. Burnett got out of the car, Mr. Boyd jumped into the front seat of the car and drove off. A police pursuit ensued. Eventually the police were able to capture the petitioners after the Cadillac wrecked on the side of the road.

In January 2014, the petitioners were indicted jointly for first degree murder, attempted murder, conspiracy to commit murder, wanton endangerment, and possession of a firearm by a prohibited person. A jury trial was held in January 2015. The petitioners were tried together. Mr. Boyd did not put on a case-in-chief. Mr. Wyche called one witness during his case-in-chief, an expert on gunshot residue. The jury convicted Mr. Boyd of attempted murder, wanton endangerment, and possession of a firearm. Mr. Wyche was convicted of voluntary manslaughter, wanton endangerment, and possession of a firearm.[11] Both petitioners subsequently were convicted on recidivist charges, which resulted in an additional

---

[11]Relevant evidentiary issues involved in the prosecution are presented under specific assignments of error.

4

five years being added to their sentences. This appeal followed the denial of post-trial motions.

## II.

## STANDARD OF REVIEW

We will dispense with our usual standard of review section because each of the assignments of error has its own review criteria.

## III.

## DISCUSSION

The petitioners have assigned ten errors herein. We will address each issue in turn.

### *A. Sufficiency of the Evidence*

Both petitioners have argued that the evidence was insufficient to sustain the verdicts against them. Insofar as the evidence presented to sustain the convictions for both petitioners was essentially the same, we will not provide a separate discussion for each petitioner on this issue.

Our cases have made clear that a challenge to the sufficiency of the evidence in a criminal case is a weighty burden to overcome. In Syllabus points 1 and 3 of *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995), we said the following:

> 1. The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

> 3. A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.[12]

---

[12]In Mr. Boyd's first assignment of error, he has asked this Court to overrule Syllabus point 3 of *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995), because of language in the syllabus point requiring that the record contain no evidence of guilt before setting aside a jury verdict for insufficient evidence. According to Mr. Boyd, this language is inconsistent with the standard of review cited in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). We summarily reject this contention. In formulating Syllabus point 3 of *Guthrie*, Justice Cleckley expressly noted that we were overruling the

(continued...)

(Footnote added).  With these review principles in mind, we examine the evidence presented.

As previously noted, Mr. Boyd did not call any witnesses and Mr. Wyche called only one witness, an expert on gunshot residue.  In this proceeding, Mr. Boyd contends that there was no evidence that he possessed a gun, and no gun was ever found; therefore, his convictions for attempted murder, wanton endangerment, and possession of a firearm could not be sustained.[13]  He also argues that the gunshot residue found on his hands could

---

[12](...continued)
prior review standard used by this Court and adopting the review standard used in *Jackson*. *See Guthrie*, 194 W. Va. at 667, 461 S.E.2d at 173 ("After contrasting [*State v. Starkey*, 161 W. Va. 517, 244 S.E.2d 219 (1978),] and its progeny with the standard of review announced in *Jackson*, we believe it is desirable to reconcile our differences and to adopt the federal standard of review both as to *Jackson* generally and as to the standard of review in circumstantial evidence cases.").  Additionally, we agree with the State that Mr. Boyd has isolated a few words in Syllabus point 3 of *Guthrie* and misapplied the true meaning of the standard of review requirements. In its proper context, the language cited by Mr. Boyd states: "Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt."  Syl. pt. 3, in part, *Guthrie*, 194 W. Va. 657, 461 S.E.2d 163.  This passage requires the presence of evidence in order for the jury to find guilt beyond a reasonable doubt.  *See United States v. Mbaye*, 827 F.3d 617, 619-20 (7th Cir. 2016) ("In analyzing Mbaye's challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the government and we will overturn the verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." (internal quotations and citation omitted)); *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997) ("Indeed, [o]nly when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." (internal quotations and citations omitted)).

[13]Mr. Boyd also made the curious argument that the most he "should have been convicted of is voluntary manslaughter because the evidence was that the shot happened
(continued...)

7

have come from any number of sources, including "handcuffs, being in a police car, a holding cell or a processing area at the jail, or just being near the assailant that shot Edmond." Mr. Boyd also contends that he fled from the Maryland police because he had drugs in his car, not because of any guilt involving the shooting at the nightclub.

Mr. Wyche argues there was no evidence that he possessed a gun, and no gun was ever found; therefore, his convictions for voluntary manslaughter, wanton endangerment, and possession of a firearm could not be sustained. He also argues that the gunshot residue found on his hands could have come from any number of sources, including "being in the vicinity of the gun when it was fired . . . , or from any of the law enforcement contact they had that evening–handcuffs, officer gloves, officer flashlights, officer gun belts, the police cruiser, or the cells wherein they were detained until their release, or any myriad location that may have been exposed to firearms."

Both petitioners also argue that the police failed to follow up on DNA found in vomit at the crime scene, which was identified as belonging to a person named Roy Winston, who had a criminal record. They also contend that the police failed to follow up

---

[13](...continued)
during the altercation between [him] and Edmond." This argument appears to assume that the jury found that Mr. Boyd was the person who shot Mr. Edmond. The evidence as presented by the State showed circumstantially that Mr. Wyche fired the shot that killed Mr. Edmond, and that Mr. Boyd fired a weapon after Mr. Edmond had already been shot.

on evidence that a violent felon named Ronald Maurice Oliver was implicated in a shooting in Martinsburg and that he drove a green Lincoln, "similar" to the Cadillac driven by Mr. Boyd.

We are not persuaded by the petitioners' arguments that the evidence was insufficient to sustain their convictions. To begin, the surviving victim, Mr. Stokes, identified the petitioners in court as the persons who got into a fight with him and Mr. Edmond. Mr. Stokes testified that, when the fight started, Mr. Wyche was near the Cadillac but moved away from it, and he lost sight of him. As the fight progressed, Mr. Stokes testified that he heard two shots. When the shots were fired, Mr. Stokes indicated that he and Mr. Edmond retreated and began running. Mr. Stokes testified that, as they ran away, he heard more shots, but that the second shots sounded different, as though fired from a different gun.[14] Mr. Stokes testified that, when he looked back, he saw the petitioners running after them. Mr. Stokes heard Mr. Edmond yell out that he was hit, so he stopped and dragged Mr. Edmond behind a vehicle and ran behind the nightclub. Mr. Stokes saw the petitioners leave the parking lot in a Cadillac. Mr. Stokes testified that, at the time of the shooting, he saw only the petitioners in the area. The State argued that the first two shots were fired by Mr. Wyche, because he was not directly engaged in the fighting. The State

---

[14]There was evidence introduced that the police found bullet casings at the crime scene from both a .25 and a .40 caliber weapon.

9

further argued that Mr. Edmond was struck by one of the shots fired by Mr. Wyche. It also was contended by the State that Mr. Boyd fired the shots that occurred after the fight broke up. The State relied on a video tape of the parking lot area which, according to the State's brief, showed "Mr. Stokes and Mr. Edmond running around the side of the bar away from the shots. The video also captures Mr. Boyd following Mr. Stokes and Mr. Edmond with his arm outstretched in front of him."[15]

Although both petitioners argue that the gunshot residue found on their hands could have come from innocent sources after they were arrested by the Maryland police, neither petitioner addresses the gunshot residue evidence presented by the State concerning Jimmy Vick. As previously noted, Mr. Vick was passed out in the backseat of the Cadillac when the petitioners fled the crime scene. When the police arrested the petitioners in Maryland, they also arrested Mr. Vick.[16] During the trial, the jury was informed that gunshot residue testing was performed on the petitioners and Mr. Vick. The jury was told that gunshot residue was found on the hands of the petitioners, but "there was no gunshot residue on the hands of Mr. Vick."

---

[15]The video was not made part of the record in this appeal.

[16]It does not appear that Mr. Vick was prosecuted for any crime in this case.

The State also presented testimony from Tamara Burnett. As previously mentioned, Mr. Boyd gave Ms. Burnett the car keys to the Cadillac before the shooting occurred and told her to drive. Ms. Burnett testified that she did not see the shooting, but that when she heard the gunshots, she put the car in gear and started to drive. After the car moved a little, the petitioners jumped into the backseat. Ms. Burnett testified that when the petitioners got into the car, they kept telling each other to shut up and not say anything. Ms. Burnett also informed the jury that when the Maryland police got behind the car and activated its lights and siren, she pulled over and stopped, but Mr. Boyd kept telling her to keep driving. Ms. Burnett testified further that when she complied with police instructions to exit the car, Mr. Boyd jumped into the driver's seat, pushed her out of the car, and drove away.

It is clear that the evidence of the petitioners' guilt was circumstantial. However,

> [i]t is now well recognized and firmly settled that proof of guilt may be established by circumstantial evidence. . . . This has been termed a rule of necessity, it being obvious that if guilt could not be proved by such evidence it would be impossible in a great many instances, to successfully prosecute perpetrators of crime.

*State v. Bailey*, 151 W. Va. 796, 804, 155 S.E.2d 850, 855 (1967). *See United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[T]he prosecution may prove its case entirely by

11

circumstantial evidence so long as guilt is established beyond a reasonable doubt."); *United States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002) ("And popular misconceptions aside, circumstantial evidence is no less probative of guilt than direct evidence."); *United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982) ("Circumstantial evidence can be and frequently is more than sufficient to establish guilt beyond a reasonable doubt."). In our review of the evidence, we are convinced that it was sufficient for the jury to find the petitioners guilty beyond a reasonable doubt. We therefore reject the petitioners' sufficiency of the evidence argument.

### B. Severance of Trial

The next assignment of error raised by Mr. Wyche, is that the circuit court committed error in denying his motion to sever his trial from that of Mr. Boyd. The State argues that the trial court did not err in denying Mr. Wyche's motion for severance. We agree.

We have held, in the context of a motion to sever criminal charges, that an abuse of discretion standard is applied in reviewing the issue. Syl. pt. 3, *State v. Hatfield*, 181 W. Va. 106, 380 S.E.2d 670 (1989) (considering a motion for severance of offenses filed under W. Va. R. Crim. P. 14(a)). We now hold that this Court will not reverse a denial of a motion to sever properly joined defendants "unless the appellant demonstrates an abuse of

discretion resulting in clear prejudice." *United States v. Flores*, 362 F.3d 1030, 1039 (8th

Cir. 2004). *See United States v. DeCologero*, 530 F.3d 36, 52 (1st Cir. 2008) (holding that

appellant "bears the burden of making a strong showing that prejudice resulted from the

denial of severance, and prejudice in this context means more than just a better chance of

acquittal at a separate trial" (internal quotations and citations omitted)); *United States v.*

*Tutis*, 167 F. Supp. 3d 683, 692 (D.N.J. 2016) ("[A] defendant bears a heavy burden in

gaining severance, and must pinpoint clear and substantial prejudice resulting in an unfair

trial." (internal quotations and citations omitted)).

Rule 8(b) and Rule 14(a) of the West Virginia Rules of Criminal Procedure

govern the issues of joinder and severance of defendants for trial. The following is provided

by Rule 8(b):

> Two or more defendants may be charged in the same
> indictment or information if they are alleged to have participated
> in the same act or transaction or in the same series of acts or
> transactions constituting an offense or offenses. Such
> defendants may be charged in one or more counts together or
> separately, and all of the defendants need not be charged in each
> count.

Rule 14(b) states, in relevant part:

> If the joinder of defendants in an indictment, an
> information, or a consolidation for trial appears to prejudice a
> defendant or the State, the Court may sever the defendants'
> trials, or provide whatever other relief that justice requires.

As pointed out by the State, in this appeal Mr. Wyche does not contend that he was improperly joined in the indictment with Mr. Boyd pursuant to Rule 8(b). Therefore our focus is only upon Rule 14(b).

The current version of Rule 14(b) was adopted by this Court in 2006. Prior to that time, severance of co-defendants was mandatory under former Rule 14(b) when requested by a defendant or the State.[17] Also, prior to the adoption of the Rules of Criminal Procedure, this Court held "that a court does not have jurisdiction in a criminal case to try jointly those defendants who choose to be tried separately." *State ex rel. Whitman v. Fox*, 160 W. Va. 633, 646, 236 S.E.2d 565, 573 (1977). In view of the current version of Rule 14(b), we now hold that, under Rule 14(b) of the West Virginia Rules of Criminal Procedure, if the joinder of defendants for trial appears to prejudice a defendant or the State, the court has discretion to sever the defendants' trials or provide whatever other relief that justice requires.

The discretion given to trial courts under Rule 14(b) to require co-defendants be tried jointly is consistent with the general rule that defendants "indicted together are tried

---

[17]The former version of Rule 14(b) read, in part, as follows:

Upon a joint indictment or information in a felony case against several persons, the court shall upon motion of any defendant or the state order separate trials.

14

together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources." *United States v. DeCologero*, 530 F.3d 36, 52 (1st Cir. 2008) (citation omitted). The Eighth Circuit has made the following observations regarding a unitary trial for co-defendants:

> When defendants are properly joined, there is a strong presumption for their joint trial, as it gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome. This presumption can only be overcome if the prejudice is severe or compelling.

*United States v. Lewis*, 557 F.3d 601, 609 (8th Cir. 2009) (internal quotations and citations omitted). To warrant severance, prejudice from joinder must be of a type against which the court is unable to afford protection. *United States v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007). The United States Supreme Court has addressed the issue as follows:

> [A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case,

15

and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated . . . , less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.

*Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 938, 122 L. Ed. 2d 317 (1993) (citations omitted).

In view of the decision in *Zafiro*, we now hold that a trial court should grant a severance under Rule 14(b) of the West Virginia Rules of Criminal Procedure only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.

Turning to the case at hand, Mr. Wyche contends that he was prejudiced by the unitary trial because the State presented a video that showed Mr. Boyd wiping his hands on his jeans when they were asked to submit to a gunshot residue test. According to Mr. Wyche, the jury could infer that Mr. Boyd was trying to remove gunshot residue from his hands and that this "impugned" him by his association with Mr. Boyd. Mr. Wyche alleges next that he was prejudiced by the unitary trial because it denied him the opportunity to cross-examine Mr. Boyd. Mr. Wyche contends that if they had had separate trials, he would have had the compulsory means with which to call Mr. Boyd as a witness. Finally, Mr. Wyche contends that evidence of flight from the police prejudiced him because he was not the driver of the

16

car. In conjunction with this argument, Mr. Wyche argued that he was unable to cross-examine Mr. Boyd about his decision to flee from the police.

The State contends that if the trials were separated, Mr. Boyd would still remain silent and not testify against himself at Mr. Wyche's separate trial. Courts "have held that [b]are assertions that co-defendants will testify are insufficient to warrant separate trials." *United States v. Davis*, 397 F.3d 173, 182-83 (3d Cir. 2005) (internal quotations and citation omitted). *Davis* also indicated "that a defendant's claim that his co-defendants would testify on his behalf must be supported by the record, and the record must show more than simply the defendant's request for declaration of [his co-defendants'] intent to testify." *Id.* Other than his self-serving assertions, Mr. Wyche has presented no evidence that Mr. Boyd would testify at a separate trial. *See United States v. Tutis*, 167 F. Supp. 3d 683, 693 (D.N.J. 2016) ("Nevertheless, 'finger-pointing and blame-shifting' alone do not call for severance, nor do 'bald assertions that co-defendants will testify.'").

Mr. Wyche asserted that some inferential evidence of Mr. Boyd's guilt, *i.e.*, wiping gunshot residue from his hands and driving the car to evade arrest, impacted his case. Courts have characterized this type of argument as the "spillover effect" of evidence. In doing so, it has been said that spillover effect "from evidence that is more damaging against a co-defendant than that against the defendant is not sufficient to warrant severance. . . . The

17

defendant must show that the spillover prejudice will prevent the jury from individualizing each defendant." *United States v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007) (citations omitted). *See United States v. Causey*, 834 F.2d 1277, 1288 (6th Cir.1987) ("[A] defendant is not entitled to a severance simply because the evidence against a codefendant is far more damaging than the evidence against him."). The State argues in a summary fashion that Mr. Wyche was not prejudiced because the jury was able to compartmentalize the evidence and distinguish the conduct of Mr. Wyche from that of Mr. Boyd. Specifically, although both petitioners faced convictions for first degree murder, the jury convicted Mr. Wyche of voluntary manslaughter and convicted Mr. Boyd of attempted murder. We agree with the State that the jury was able to compartmentalize the evidence and that Mr. Wyche has failed to show that he was prejudiced by a unitary trial. *See United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) ("Prejudice can be demonstrated by showing that the jury will be unable to compartmentalize the evidence as it relates to the separate defendants because of a 'prejudicial spillover effect.'").

### C. Peremptory Strike of Juror

Mr. Wyche contends that the trial court erred in allowing the State to use a peremptory strike to remove the only juror of "color". Mr. Wyche argued before the circuit court that under the United States Supreme Court decision in *Batson v. Kentucky*, 476 U.S.

18

79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the State could not strike the only juror of color because of his race. The State contends that it did not strike the juror because of his race.

We have held that, "[u]pon review, this Court will afford great weight to a trial court's findings as to whether a peremptory strike was used to advance racial or sexual discrimination." Syl. pt. 4, *Parham v. Horace Mann Ins. Co.*, 200 W. Va. 609, 490 S.E.2d 696 (1997). It also has been recognized, and we so hold, that "[w]e review jury selection under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), *de novo*, but we review underlying factual findings for clear error." *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008). *See United States v. Mickens*, 408 F. App'x 253, 255 (11th Cir. 2011) ("We review for clear error a trial judge's finding that a prosecutor has exercised peremptory strikes free of discriminatory intent."). We review the trial court's ultimate disposition for abuse of discretion. *See United States v. Villa*, 99 F.3d 1135, 1996 WL 595633, at *1 (5th Cir. 1996) ("The Government articulated racially-neutral reasons for the exercise of its peremptory strikes and the district court did not abuse its discretion when it determined that Villa had failed to meet his burden of proving purposeful discrimination."); *United States v. Thompson*, 74 F.3d 1236, 1995 WL 783391, at *1 (5th Cir. 1995) ("The district court did not abuse its discretion in overruling Thompson's objection to the striking of potential jurors pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986)[,] because the government articulated race-neutral explanations for each challenged strike.").

19

We begin by noting that "[i]t is a violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution for a member of a cognizable racial group to be tried on criminal charges by a jury from which members of his race have been purposely excluded." Syl. pt. 1, *State v. Marrs*, 180 W. Va. 693, 379 S.E.2d 497 (1989). In the *Batson* decision, the Supreme Court articulated the basic analytical framework to apply when determining whether a peremptory strike was used for a discriminatory purpose. In cases in which peremptory strikes are challenged as being discriminatorily motivated, the *Batson* framework is used to help ensure the equality of all citizens and the integrity of our jury selection process. We addressed the *Batson* framework in Syllabus point 6 of *Parham* as follows:

> If a peremptory strike is challenged as being discriminatorily motivated in violation of equal protection, it is the duty of the trial court to apply the analytical framework set forth by the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and its progeny, together with any elucidations thereof adopted by this Court, before the venireperson is removed from the panel. If the challenge proves meritorious, the trial court shall disallow the strike.

200 W. Va. 609, 490 S.E.2d 696. It also was held in *Parham* that "[w]hen a peremptory strike is challenged, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Syl. pt. 2, *Parham*, *id.*

20

We adopted the *Batson* framework in Syllabus points 2 and 3 of *Marrs*, as follows:

> 2. To establish a prima facie case for a violation of equal protection due to racial discrimination in the use of peremptory jury challenges by the State, "the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." [Citations omitted.] *Batson v. Kentucky*, 476 U.S. 79 at 96, 106 S. Ct. 1712 at 1722, 90 L. Ed. 2d 69 (1986).

> 3. The State may defeat a defendant's prima facie case of a violation of equal protection due to racial discrimination in selection of a jury by providing non-racial, credible reasons for using its peremptory challenges to strike members of the defendant's race from the jury.

180 W. Va. 693, 379 S.E.2d 497.

The record in this case indicates that Mr. Wyche is an African-American. During jury selection, it was determined that a potential juror, M.W., was an ethnic minority. On his jury questionnaire, M.W. indicated that he was Caucasian. Upon further inquiry at trial, it was determined that M.W. was an Hispanic, whose mother was Cuban. Over the objection of Mr. Wyche, the State exercised a peremptory strike to remove M.W. Mr. Wyche

21

argued that the State struck M.W. because he was an ethnic minority in violation of *Batson*.[18]

The State presented the following reasons to the trial court for striking M.W.:

> The reason we're striking him, as the Court knows, as we earlier said, this man is being prosecuted for DUI from my office right now. It's an active case. I don't want any appearance that we are giving him favors by whatever verdict he may or may not give in this regard. I don't want him to feel any pressure because I'm involved in this particular instance. It has nothing to do with race whatsoever.
>
> The other also troubling item with this individual is that he had some hearing difficulty which we know we can fix and we can cure. But it was concerning to the state that he did not appear to really understand or did not hear a lot of the Court's questions originally. And that's also concerning. That may be just the courtroom.
>
> But the primary reason for striking him is the pending DUI charge that's active. He has a hearing scheduled tomorrow which, of course, the Court can move; but it's still a problem with the state. It's an appearance for the state, and we have a problem with it.

Mr. Wyche argued below and in this appeal that the State's reasons for striking M.W. were pretextual. Mr. Wyche contended that M.W. was not disqualified from serving as a juror because of the pending DUI charge, and that if M.W. had a jury trial, the jury

---

[18]*See United States v. Rodriguez*, 935 F.2d 194, 195 (11th Cir. 1991) ("In [*Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991),] the Supreme Court held that the equal protection clause and the principles of third party standing, allow any criminal defendant to object to race-based exclusions of jurors through preemptory challenges whether or not the defendant and the excluded jurors share the same race.").

would not come from the pool that was hearing his case. Mr. Wyche also indicated that the trial court could assist M.W. with his hearing impairment.

The trial court found that the State's reason for striking M.W. was not pretextual. The court found as follows:

> THE COURT: . . . The issue really is whether the state has shown a valid, non-discriminatory reason for exercising its peremptory to remove [M.W.] from the panel.
>
> The state finds itself in a situation where they have a pending case against a juror. The juror's case is actively set and prosecuted by this office. He [M.W.] has a certain understanding of it which, you know, didn't seem all that nefarious. But as the state explains, no matter what it does from this point going forward, if the jury votes to acquit, and he gets hammered on the DUI case, they're retaliating against him for an unfavorable verdict. If he votes to convict, and the jury comes out or his case–his DUI case comes out to be this misunderstanding, which would be his take on it, they're viewed as having favored his side. And they have an obligation to enforce the laws.
>
> I think it's–you know, this is a particularly valid reason for them to exercise their rights to excuse the juror and take themselves out of that situation where they could have it. I'll note the argument of Mr. Wyche and his counsel and as adopted by Mr. Boyd and his counsel and will simply state that that error has been well made and well preserved. But I just think moving forward, I have to let the state make its strike based on the reasons it has given.

In view of the record on the issue, we cannot find that the trial court abused its

discretion in rejecting Mr. Wyche's *Batson* challenge to striking M.W.[19]


## D. Evidence of Gunshot Residue

Mr. Wyche's next assignment of error is that the trial court should not have

admitted evidence of the gunshot residue found on his hands. Mr. Wyche has set out four

issues involved with this assignment of error: (1) chain of custody of gunshot residue

evidence, (2) taking gunshot residue sample without warrant or consent, (3) taking gunshot

residue sample without *Miranda* warning, and (4) excluding gunshot residue evidence as

irrelevant and unfairly prejudicial. We will address these issues separately.


At the outset we observe that

> "[t]he action of a trial court in admitting or excluding
> evidence in the exercise of its discretion will not be disturbed by
> the appellate court unless it appears that such action amounts to
> an abuse of discretion." Syllabus point 10, *State v. Huffman*,
> 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other
> grounds*, *State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d
> 893 (1994).

---

[19]In his post-trial motion and on appeal, Mr. Wyche has provided information regarding M.W. sitting as a juror several weeks after his trial. The trial court considered this information and rejected it. The trial court found that the facts involved with the subsequent case were different from the facts surrounding Mr. Wyche's case. We agree with the trial court and reject this newly acquired evidence as demonstrating the State's reason for striking M.W. was pretextual.

Syl. pt. 1, *State v. Calloway*, 207 W. Va. 43, 528 S.E.2d 490 (1999).

**1. Chain of custody of gunshot residue evidence.** Mr. Wyche contends that the gunshot residue evidence should have been suppressed because the State failed to establish an adequate chain of custody between the taking and testing of the evidence. The State contends that it properly authenticated the gunshot residue during the suppression hearing.

The standard of review for an issue involving chain of custody has been stated by this Court as follows:

> The preliminary issue of whether a sufficient chain of custody has been shown to permit the admission of physical evidence is for the trial court to resolve. Absent abuse of discretion, that decision will not be disturbed on appeal.

Syl. pt. 2, *State v. Davis*, 164 W. Va. 783, 266 S.E.2d 909 (1980). We held in Syllabus point 2 of *State v. Charlot*, 157 W. Va. 994, 206 S.E.2d 908 (1974), the following:

> When an object or article has passed through several hands while being analyzed or examined before being produced in court, it is not possible to establish its identity by a single witness, but if a complete chain of evidence is established, tracing the possession of the object or article to the final custodian, it may be properly introduced in evidence.

In other words, "[c]hain of custody authentication requires testimony of continuous possession by each individual in the custody link, together with testimony by each that the

25

object remained in substantially the same condition during its presence in his or her possession." Louis J. Palmer, Jr.; Robin Jean Davis; and Franklin D. Cleckley, Vol. 2, *Handbook on Evidence for West Virginia Lawyers*, § 901.04[2][c], pg. 440 (6th ed. 2015).

This issue need not detain us. Mr. Wyche has made conclusory allegations about the authenticity of the gunshot residue evidence, but has failed to show how the evidence was not what the State presented it to be. During the suppression hearing, the State presented evidence from the West Virginia law enforcement officer who tested Mr. Wyche's hands for gunshot residue while in the Maryland jail. The officer testified that, after he took samples from Mr. Wyche's hands, he placed the samples in an envelope and wrote on the envelope the date and time. The officer said he forgot to indicate the time on the testing form. The officer testified further that he took the sealed testing kit and stored it until it was delivered to the West Virginia State Police Laboratory. At trial, the supervisor of the Trace Evidence Section of the Police Laboratory testified that she received the test kit in a sealed envelope with the testing officer's name on it. Mr. Wyche contends that the State's witness at trial could not give assurances as to the reliability of the sample and whether it could have been tainted; therefore, the evidence should not have been admitted. We reject this. "When the proponent authenticates evidence by tracing a chain of custody, the mere possibility of a break in that chain does not render the item inadmissible, but is an issue for the jury to

26

consider in determining the sufficiency of the proof." Palmer, et al., Vol. 2, *Handbook on Evidence*, § 901.04[2][c], pg. 439.

**2. Taking gunshot residue sample without warrant or consent.** Mr. Wyche also contends that the gunshot residue should have been suppressed because it was taken from him without a warrant or his consent. The State argues that our case law has made clear that neither a search warrant nor consent is needed for the police to subject a suspect to gunshot residue testing.

We previously have recognized that the "superficial examination of a lawfully arrested individual for evidence of gunpowder residue is not violative of the Fourth Amendment prohibition against unreasonable searches and seizures." *State v. Riley*, 201 W. Va. 708, 717, 500 S.E.2d 524, 533 (1997). As we pointed out in *Riley*, in the decision in *Cupp v. Murphy*, 412 U.S. 291, 93 S. Ct. 2000, 36 L. Ed. 2d 900 (1973), the United States Supreme Court upheld the taking of fingernail scrapings from a murder suspect without a warrant or consent, where police had noted possible blood stains on the hand and had otherwise established probable cause to arrest. *Cupp* held that,

> considering the existence of probable cause, the very limited intrusion undertaken incident to the stationhouse detention, and the ready destructibility of the evidence, we cannot say that this search violated the Fourth and Fourteenth Amendments.

*Cupp*, 412 U.S. at 296, 93 S. Ct. at 2004, 36 L. Ed. 2d 900.

27

The court in *United States v. Jones*, No. 10-336 JNE/AJB, 2011 WL 1837861

(D. Minn. Mar. 31, 2011), succinctly stated the general rule regarding the testing of a suspect

for gunshot residue without a warrant or consent:

> Defendant Jesse Jones argues that gun shot residue evidence
> should be suppressed because it was obtained without search
> warrant authorization. By its nature, gun shot residue evidence,
> like blood alcohol evidence, is subject to loss or destruction in
> the absence of immediate affirmative efforts to preserve the
> evidence. Warrantless seizure of such evidence is lawful when
> there is probable cause to believe that the evidence will be found
> and there are exigent circumstances to support the seizure.
> Moreover, gunpowder on a suspect's person is subject to
> removal and destruction, and it is therefore reasonable to seize
> such evidence from the person as an incident to the suspect's
> arrest. . . . Defendant's motion to suppress gun shot residue
> evidence should be denied.

*Jones*, 2011 WL 1837861, at *5.[20]

---

[20]*See United States v. Simmons*, 380 F. App'x 323, 330 (4th Cir. 2010) ("The magistrate judge, after conducting an evidentiary hearing, concluded that Simmons was lawfully arrested and that, given the inherent destructibility of gun-shot residue evidence, the police were permitted to run the GSR test without a warrant. The district court adopted that recommendation, and we conclude that the district court correctly denied the motion to suppress."); *United States v. Johnson*, 445 F.3d 793, 796 (5th Cir. 2006) ("Taken together, this evidence was more than sufficient to establish probable cause for Johnson's arrest. Accordingly, the arrest, and the gun powder residue test performed incident thereto, were lawful. The district court did not err in denying the motion to suppress."); *Long v. Beres*, No. 3:10CV532, 2013 WL 139342, at *7 (E.D. Va. Jan. 10, 2013) ("Because probable cause and exigent circumstances existed to justify the GSR Test of Long's hands, no Fourth Amendment violation occurred."); *United States v. Pettiford*, 295 F. Supp. 2d 552, 560-61 (D. Md. 2003) ("Furthermore, the Court finds that exigent circumstances existed in light of the ready destructibility of the evidence sought. If Detective Jenkins had waited for a warrant before ordering the GSR test, he would have increased Pettiford's opportunity to destroy the evidence by simply washing his hands."); *State v. Beasley*, 205 Ariz. 334, 337,

(continued...)

28

In the instant proceeding, Mr. Wyche was arrested in Maryland and identified

[20](...continued)
70 P.3d 463, 466 (Ct. App. 2003) ("no warrant was required for a reasonable search incident to a valid arrest" (citations omitted)); *Ray v. State*, 304 Ark. 489, 498, 803 S.W.2d 894, 899 (1991) ("The gunpowder residue test was administered because appellant was a suspect in the shooting. Under exigent circumstances, such as where the opportunity to make the test will exist only for a short time, certain warrantless intrusions have been held to be reasonable and not in violation of any protected rights."); *People v. Allen*, 376 Ill. App. 3d 511, 520, 875 N.E.2d 1221, 1228 (2007) ("Because the hand swabbing was so 'minor an imposition that the defendant suffered no true humiliation or affront to his dignity,' we find a search warrant was not required to justify the GSR test after defendant was in custody and while the arresting officers were assigned to investigate the April 17 attempt robbery."); *Jones v. State*, 213 Md. App. 483, 501, 74 A.3d 802, 812 (2013) ("Opinions of the appellate courts of our sister States are largely consistent with the Federal precedents discussed above, holding that the warrantless collection of GSR evidence from an individual whom the police have probable cause to believe has recently fired a gun in the course of committing a crime, does not violate the Fourth Amendment's prohibition against unreasonable searches and seizures."); *Hubbert v. State*, 759 So. 2d 504, 508 (Miss. Ct. App. 2000) ("Because the chemicals sought to be found on Hubbert's hand could have been easily and quickly destroyed, the officers would have been within their rights to swab Hubbert's hand even over his objections."); *State v. Coplen*, 138 N.C. App. 48, 57, 530 S.E.2d 313, 320 (2000) ("Believing that the above findings of fact adequately support the conclusion that probable cause and exigent circumstances existed at the time of the gunshot residue test, we hold that the warrantless search was valid."); *Commonwealth v. Simonson*, 148 A.3d 792, 801 (Pa. 2016) ("Therefore, we conclude that the gunshot residue test has a negligible intrusion upon an individual's privacy and that it serves an important function in promoting vital governmental interests. As such, we conclude that the gunshot residue test constitutes a reasonable search incident to arrest."); *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005) ("Thus, we conclude that the duct tape evidence and the results of the gunshot residue test were properly admitted into evidence as obtained incident to an arrest upon probable cause."); *Johnson v. State*, No. 04-13-00766-CR, 2014 WL 7339506, at *3 (Tex. App. Dec. 23, 2014) ("All of the factors in this case weigh in favor of the conclusion that the swabbing of Johnson's hands and fingers for gunshot residue was reasonable."); *Sen v. State*, 301 P.3d 106, 118 (Wyo. 2013) ("Consistent with the conclusions reached in cases set forth above, we find that, in light of the minimal intrusion caused by the swab for gunshot residue and the easy destructibility of such evidence, administration of the gunshot residue test was a valid search incident to arrest.").

by West Virginia law enforcement officers as one of the individuals believed to have used a firearm in the commission of a crime in West Virginia. The fact that Mr. Wyche was in custody in Maryland made it extremely likely that any gunshot residue on his hands would be destroyed by the time he eventually returned to West Virginia.[21] Under these facts, exigent circumstances existed for the minimal intrusion of swabbing his hands for possible gunshot residue. Although the West Virginia law enforcement officers were outside their jurisdiction, we generally have recognized that "[a] law enforcement officer acting outside of his or her territorial jurisdiction has the same authority to arrest as does a private citizen and may make an extraterritorial arrest under those circumstances in which a private citizen would be authorized to make an arrest." Syl. pt. 2, *State ex rel. State v. Gustke*, 205 W. Va. 72, 516 S.E.2d 283 (1999). Mr. Wyche's brief has cited to *Gustke,* but he has not provided any argument regarding the extent of the authority of the police acting as a private citizen.

Assuming, without deciding, that the police did not have authority as private citizens to conduct a gunshot residue test of Mr. Wyche,[22] we find that any error in admitting the gunshot residue evidence was harmless beyond a reasonable doubt. *See* Syl. pt. 5, *State*

---

[21]Contrary to suggestions by Mr. Wyche, Deputy Christian testified that he "assumed that they were under arrest pursuant to the pursuit and being taken into custody."

[22]*See State v. Sills*, 852 So. 2d 390, 391-92 (Fla. Dist. Ct. App. 2003) ("[I]n obtaining consent to conduct the warrantless search of Sills' home outside their jurisdiction, the officers were acting under color of office to obtain evidence not available to private citizens and, therefore, the evidence must be suppressed.").

*ex rel. Grob v. Blair*, 158 W. Va. 647, 214 S.E.2d 330 (1975) ("Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt."). As previously discussed in this opinion, we have thoroughly reviewed the evidence in this case and find that the evidence was sufficient for the jury to find Mr. Wyche guilty of all charges without the evidence of the gunshot residue.

**3. Taking gunshot residue sample without Miranda warning.** Mr. Wyche further argues that evidence of the gunshot residue should have been suppressed because he was not given *Miranda* warnings[23] until after residue was removed from his hands. Other than make this assertion, Mr. Wyche has not cited to any legal authority to support this insufficiently briefed issue. Consequently, we find this issue to be waived. *See State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are . . . mentioned only in passing but are not supported with pertinent authority . . . are not considered on appeal." (citation omitted)); *State v. Lilly*, 194 W. Va. 595, 605 n.16, 461 S.E.2d 101, 111 n.16 (1995) ("[C]asual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal." (internal quotations and citation omitted)).

---

[23]*See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

31

We will note that courts addressing the issue of conducting a gunshot residue test, without a warrant, have found that this test does not implicate the protections of *Miranda*. *See Jones v. State*, 213 Md. App. 483, 495, 74 A.3d 802, 809 (2013) ("Moreover, appellant does not contend, and the record does not indicate that the GSR test was conducted in conjunction with any interrogation by the police. Therefore, his rights under the protections afforded by the Fifth Amendment or *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are likewise inapplicable."); *State v. Odom*, 303 N.C. 163, 167, 277 S.E.2d 352, 355 (1981) ("We are unable to perceive any difference in the giving of a gunshot residue test that would require the presence of counsel to protect defendant's rights at trial. Thus, we hold that the administration of a gunshot residue test is not a critical stage of the criminal proceedings to which the constitutional right to counsel attaches and that defendant's right to counsel was not violated by the admission of the challenged testimony.").

**4.** **Excluding gunshot residue evidence as irrelevant and unfairly prejudicial.** Mr. Wyche finally argues that evidence of the gunshot residue should have been excluded as irrelevant and unduly prejudicial under Rule 401 and Rule 403 of the West Virginia Rules of Evidence. The State argues that the evidence was relevant and was not unduly prejudicial. We need not spend any time on this issue because it has not been briefed sufficiently. The sum total of Mr. Wyche's argument on this issue is one sentence wherein

he states that the evidence was not relevant because it was not properly collected and "the probative value of the same is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." This is neither legal analysis of the law nor the facts of the case–this sentence merely contains baseless conclusions. We do not address conclusions; we address adequately briefed assignments of error. *See Sale ex rel. Sale v. Goldman*, 208 W. Va. 186, 199-200 n.22, 539 S.E.2d 446, 459-60 n.22 (2000) (deeming assignment of error that "is terse and lacks any authority to support it" to have been waived).[24]

### E. The State Disclosed Certain Evidence Late

The next assignment of error by Mr. Wyche is that the trial court should have granted him a new trial "based upon the prejudicial errors resulting from the State's *Brady* violation in failing to disclose, until the eve of trial and at trial, critical discovery, including exculpatory material, needed to adequately prepare a defense at trial." We find no merit to this issue.

---

[24]The analysis that Mr. Wyche's brief has under this issue relates to an alleged *Brady* violation–failure to turn over evidence–which is the subject of his fifth assignment of error. The *Brady* issue that is tersely briefed in this section has no connection with Rule 401 or Rule 403. It is set out as though it was incorrectly cut and pasted into this section. We will discuss the misplaced *Brady* material in the fourth assignment of error during our discussion of the fifth assignment of error.

Mr. Wyche contends that the State suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We have held that "[a] claim of a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), presents mixed questions of law and fact. Consequently, the circuit court's factual findings should be reviewed under a clearly erroneous standard, and questions of law are subject to a *de novo* review." Syl. pt. 7, *State v. Black*, 227 W. Va. 297, 708 S.E.2d 491 (2010). We have outlined the requirements for showing a *Brady* violation as follows:

> There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial.

Syl. pt. 2, *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007).

As a general matter, "'[a] *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused.'" *State v. Morris*, 227 W. Va. 76, 84, 705 S.E.2d 583, 591 (2010) (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 869-70, 126 S. Ct. 2188, 2190, 165 L. Ed. 2d 269 (2006)). Mr. Wyche has not alleged that the State failed to disclose *Brady* information. Mr. Wyche's contention is that *Brady* information was

34

not disclosed until the eve of trial and at trial. We have recognized the following regarding late disclosure of alleged *Brady* information:

> "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process simply because it did not produce the evidence sooner. There is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial."

*State v. Cooper*, 217 W. Va. 613, 618, 619 S.E.2d 126, 131 (2005) (quoting *In re United States*, 267 F.3d 132, 144 (2d Cir. 2001)). In other words, to the extent that Mr. Wyche did not receive *Brady* information until the eve of trial and at trial, he may raise a *Brady* violation allegation.

Mr. Wyche's *Brady* violation involves three areas. First, Mr. Wyche contends that "discovery delays" amounted to a *Brady* violation. We will not engage this issue because, other than noting that "[a]pproximately one week before trial, the State began to disclose the bulk of its discovery," Mr. Wyche has failed to develop this issue. The first requirement of the *Brady* test is showing that the evidence the defendant learned about was exculpatory or impeachment evidence. A blanket assertion that discovery was delayed does not satisfy the first element under the *Brady* test. Consequently, we reject this issue on the merits and as insufficiently briefed.

35

The second issue raised by Mr. Wyche as a *Brady* violation is the "late disclosure of the [gunshot residue] testing protocols." The initial problem with this issue is that it is not developed under the fifth assignment of error. The issue is discussed, as previously mentioned, as a sub-issue under the fourth assignment of error. In that sub-issue, Mr. Wyche argues that he received the gunshot residue testing protocols late and that he did not receive "video or audio evidence" of the officer taking residue from his hands.

With respect to the gunshot residue testing protocols, the State points out that Mr. Wyche received the testing protocols sufficiently in time to file a motion to suppress the evidence; he was able to cross-examine the officer who took the samples and the forensic analyst who conducted the test; and he called a retained expert chemist to testify about gunshot residue. We agree with the State that these facts take the issue out of *Brady* because Mr. Wyche has failed to show how the "delay" in producing information prevented him from effectively using this evidence in his defense.

As to Mr. Wyche's claim that the State did not provide him with video or audio evidence of the officer taking residue from his hands, this issue is tied to the fact that his co-defendant, Mr. Boyd, was videotaped while residue testing was done on his hands. The State notes that it was only coincidental that Mr. Boyd was tested for residue while he was in the interview room, which had a camera, giving a voluntary statement to the police. Mr. Wyche

36

has not alleged that the State possesses a video or audio of residue being taken from his hands; he is making the unsustainable argument that *Brady* requires such testing be recorded. *Brady* does not require the creation of evidence–it requires the disclosure of existing exculpatory or impeachment evidence. We reject this issue as implicating *Brady*.

The final issue raised by Mr. Wyche as a *Brady* violation involves testimony by a lead investigator in the case. The investigator testified during the trial that his investigation of the person who left vomit in the parking lot where the shooting occurred was still pending. Mr. Wyche alleges that this disclosure during trial was *Brady* evidence. The State points out that DNA from the vomit matched an individual named Roy Winston.[25] Mr. Wyche has not disputed the State's assertion that he was given information about the results of the DNA testing. More importantly, the State asserts that "[t]here was no evidence linking Mr. Winston to the crime. There was only evidence to show that Mr. Winston had thrown up outside of the bar at some point in time." The fact that Mr. Wyche did not learn until trial that a lead investigator had not closed the investigation of Mr. Winston does not rise to the level of being exculpatory or impeachment evidence under *Brady*. Moreover, we reject Mr. Wyche's unsupported contention that if the officer had "completed his investigation before trial, it could have led to direct evidence that exculpates [him]." *Brady* does not require the

---

[25]The State was able to match the DNA to Mr. Winston because he had a criminal record.

State exhaust its investigation of a crime before it prosecutes an individual that it has evidence to prove committed the crime. In sum, the trial court did not abuse its discretion in denying Mr. Wyche's motion for new trial based upon an alleged *Brady* violation.

### F. An Investigating Officer was Permitted to Sit at the State's Table

The next issue raised by Mr. Wyche is that the trial court committed error in denying his motion to sequester a lead investigator in the case, Deputy W. Christian. The State argues that the trial court properly allowed Deputy Christian to remain at its table during the trial under Rule 615(b) of the West Virginia Rules of Evidence.

Our standard of review of a trial court's sequester ruling has been set out as follows:

> The question as to which witnesses may be exempt from a sequestration of witnesses ordered by the court lies within the discretion of the trial court, and unless the trial court acts arbitrarily to the prejudice of the rights of the defendant the exercise of such discretion will not be disturbed on appeal.

Syl. pt. 4, *State v. Wilson*, 157 W. Va. 1036, 207 S.E.2d 174 (1974). *Accord* Syl. pt. 7, *State v. McKenzie*, 197 W. Va. 429, 475 S.E.2d 521 (1996). The guidelines for sequestering witnesses are set out under Rule 615:

> At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize excluding:

38

(a) a party who is a natural person;

(b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney;

(c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or

(d) a person the court believes should be permitted to be present.

We have indicated that the purpose of Rule 615 "is to prevent the shaping of testimony by one witness to match that of another and to discourage fabrication and collusion." Syl. pt. 2, in part, *State v. Omechinski*, 196 W. Va. 41, 468 S.E.2d 173 (1996).

As previously indicated, in this case the State relied upon Rule 615(b) to permit Deputy Christian to remain in the courtroom at its table throughout the trial. The ability of the State to designate a law enforcement officer as its representative under Rule 615(b) has been explained in the context of the federal rule as follows:

Federal courts have relied on Rule 615(b) to permit federal prosecutors to designate investigative agents as a representative. Such an exception is supported by the legislative history of the rule. Congress specifically intended that case investigative agents be included in the potential designees:

[T]he practice is permitted as an exception to the rule of exclusion and compares with the situation defense counsel finds himself in–he always has the client with him to consult during the trial. The investigative agent's presence may be extremely important to government counsel especially when the case is complex or involves some specialized subject matter. The

39

agent, too, having lived with the case for a long time, may be able to assist in meeting trial surprises where the best-prepared counsel would otherwise have difficulty.

Palmer, et al., Vol. I, *Handbook on Evidence*, § 615.04, pgs. 1046-47 (quoting Report of Senate Committee on the Judiciary, S. Rep. No. 1277, 93d Cong., 2d Sess. (1974)).

Mr. Wyche contends that the trial court should not have permitted Deputy Christian to remain in the courtroom. The position taken by Mr. Wyche is not consistent with the intent of Rule 615(b). The rule expressly states that it does not authorize a trial court to exclude someone "designated as the party's representative by its attorney." As a result of the plain language of the rule, the trial court had to permit the State's designated representative to remain in the courtroom.[26]

---

[26]An issue not directly raised by Mr. Wyche is whether Deputy Christian should have been permitted to testify as the State's last witness. We indicated in *State v. McKenzie*, 197 W. Va. 429, 445, 475 S.E.2d 521, 537 (1996), that a person designated as the State's representative "should ordinarily be called first to testify." *See United States v. Frazier*, 417 F.2d 1138, 1139 (4th Cir. 1969) ("Where the agent is the one in charge of the case and his presence is necessary, the court may permit him to remain although other witnesses are excluded. In that case, if it is anticipated that the agent will be called as a witness he should ordinarily be called first so as to avoid giving the prosecution unfair advantage or the appearance that the prosecution is being favored. This should be the order of presentation unless, in the judge's considered opinion, it would unduly break the continuity and seriously impair the coherence of the Government's proof."). Assuming, for the sake of argument, that Mr. Wyche had properly raised the issue of requiring Deputy Christian to testify first, we do not believe that under the facts of this case it would have been an abuse of discretion in allowing the officer to testify last. This was not a complicated evidentiary case, such that Deputy Christian could adjust his testimony on substantive issues based upon the testimony of other witnesses. Deputy Christian did not testify as to a confession by Mr. Wyche, or

(continued...)

40

### G. Limiting Cross-examination about an Investigating Officer

The next issue raised by Mr. Wyche concerns the trial court's limitation of his cross-examination of Chief Deputy G. Harmison regarding the status of a former officer, Captain D. Streets. The State contends that such questioning was not relevant to the scope of the testimony of Chief Deputy Harmison.

This Court's standard of review of a trial court's ruling on the extent of cross-examination was set out in Syllabus point 8 of *State v. Davis*, 176 W. Va. 454, 345 S.E.2d 549 (1986), as follows:

> "The extent of cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice." Syl. pt. 4, *State v. Carduff*, 142 W.Va. 18, 93 S.E.2d 502 (1956).

The scope of cross-examination of a non-party is governed by Rule 611(b)(2) of the West Virginia Rules of Evidence which provides, in part, that "[c]ross-examination should be

---

[26](...continued)
provide substantive testimony about a witness who saw Mr. Wyche shoot the victim, or a witness who informed Deputy Christian that Mr. Wyche implicated himself in the shooting. In fact, the general complaint Mr. Wyche has with Deputy Christian being in the courtroom is that he believes the deputy was able "to listen to the testimony of other officers and alter his responses to paint the investigation in a more favorable light to the prejudice of the Defendant." This would not have been grounds for granting Mr. Wyche a new trial even if the issue of testifying first had been properly raised.

limited to the subject matter of the direct examination and matters affecting the credibility of the non-party witness." In Syllabus point 4 of *State v. Richey*, 171 W. Va. 342, 298 S.E.2d 879 (1982), we held the following regarding the scope of cross-examination:

> Several basic rules exist as to cross-examination of a witness. The first is that the scope of cross-examination is coextensive with, and limited by, the material evidence given on direct examination. The second is that a witness may also be cross-examined about matters affecting his credibility. The term "credibility" includes the interest and bias of the witness, inconsistent statements made by the witness and to a certain extent the witness' character. The third rule is that the trial judge has discretion as to the extent of cross-examination.

*See State v. Potter*, 197 W. Va. 734, 749, 478 S.E.2d 742, 757 (1996) ("'A party may be cross-examined on any matter relevant to any issue in the case, including credibility.' W. Va. R. Evid. 611(b)(1).").

In the instant proceeding, Mr. Wyche sought to question Chief Deputy Harmison about Captain Streets, who was indicted for taking and selling firearms that belonged to the Sheriff's Department and firearms from closed cases that were ordered to be destroyed. During his direct examination, Chief Deputy Harmison did not testify about Captain Streets. Consequently, the State objected to Mr. Wyche's attempt to cross-examine Chief Deputy Harmison about the status of Captain Streets' employment and handling of firearms. Mr. Wyche contends that such cross-examination was relevant because he was accused of having fired a weapon that was never found.

Assuming, for the sake of argument, that the information Mr. Wyche sought to obtain from Chief Deputy Harmison was relevant, the trial court did not abuse its discretion in prohibiting Mr. Wyche from exceeding the scope of direct examination. It has been observed that "[i]f a party on cross-examination needs to go beyond the subject matter of direct, he or she is required under most circumstances to call that witness in the cross-examiner's case-in-chief." Palmer, et al., Vol. 1, *Handbook on Evidence*, § 611.04[2][b], pgs. 943-44. *See* Syl. pt. 5, *State v. Price*, 92 W. Va. 542, 115 S.E. 393 (1922) ("The right of cross-examination of a witness not a party to the suit is limited to inquiries about facts or circumstances brought out on the examination in chief. If it is desired to examine such witness upon other matters, the party must make him his own witness and introduce him as such in the subsequent progress of the case."). Mr. Wyche has not argued that he was prevented from calling Chief Deputy Harmison or Captain Streets during his case-in-chief.[27]

### H. Admission of Evidence from Dash Camera Video

Mr. Wyche additionally contends that the State did not comply with the authentication requirements of Rule 901 of the West Virginia Rules of Evidence when it admitted into evidence a dash camera video of the police pursuit of the car he was riding in

---

[27]In fact, during a sidebar discussion of the issue, it was mentioned that the State had, in fact, listed Captain Streets as a witness.

when he was arrested in Maryland. The State argues that the evidence was properly authenticated.

We have held that "[a] trial court is afforded wide discretion in determining the admissibility of videotapes and motion pictures." Syl. pt. 1, *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W. Va. 492, 345 S.E.2d 791 (1986). This Court also has indicated, and we now hold, a trial court's ruling on authenticity of evidence under Rule 901(a) of the West Virginia Rules of Evidence will not be disturbed on appeal "unless there has been an abuse of discretion." *State v. Jenkins*, 195 W. Va. 620, 624, 466 S.E.2d 471, 475 (1995). Under Rule 901(a), a court may not admit evidence "unless it is authenticated in a manner sufficient to support a finding that the proffered object is what the proponent of its admission claims it is." *State v. Beard*, 194 W. Va. 740, 751, 461 S.E.2d 486, 497 (1995). It has been recognized that

> the standard of admissibility under Rule 901(a) is rather slight, *i.e.*, is the evidence sufficient "to support a finding" that the object is authentic. Therefore, even where the chain of custody is not complete, the evidence may be held sufficient to be admitted under Rule 901(a).

Palmer, et al., Vol. 2, *Handbook on Evidence*, § 901.03, pgs. 431-32.

In this proceeding, the State introduced videotape evidence recorded by the dash camera that was on the police car driven by Trooper Conner of the Maryland State

44

Police. As previously noted, the videotape showed the initial stop of the car Mr. Wyche was riding in and the chase that ensued. The State indicates that, at the time of the trial, Trooper Conner was no longer employed with the Maryland State Police, and his whereabouts were unknown. To admit the videotape, the State called three witnesses. First, the State called Corporal R. Shaffer of the Maryland State Police. Corporal Shaffer testified that he was responsible for maintaining dash camera videotapes from the police cruisers of officers in the Washington County barracks. Corporal Shaffer indicated that he removed footage of the chase scene from the dash camera of the cruiser Trooper Conner drove, and that a copy of the footage was sent to West Virginia authorities. The State also called Master Trooper R. Miller of the Maryland State Police. Trooper Miller testified that when Trooper Conner initially stopped the car Mr. Wyche was riding in, he arrived on the scene in his cruiser and observed events. Trooper Miller indicated that he saw the driver of the car get out and observed the car immediately drive away. Trooper Miller followed behind Trooper Conner's cruiser and engaged in the pursuit. Trooper Miller testified that he watched the footage of the chase that was removed from the cruiser driven by Trooper Conner and that it accurately depicted the events of the chase as he observed them. The final witness called by the State on the issue was the lead investigator, Deputy Christian, of the Berkeley County Sheriff's Department. Deputy Christian testified that he received the videotape of the chase from the Maryland State Police.

Mr. Wyche contends that the videotape was not admissible because it could be authenticated only by Trooper Connor. We reject this argument. "The burden to authenticate under the rule is not high–only a prima facie showing is required." Palmer, et al., Vol. 2, *Handbook on Evidence*, § 901.03, pg. 433. As noted by the Fourth Circuit, "[t]he factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). The videotape was sufficiently authenticated by the officer responsible for maintaining cruiser videotapes, Corporal Shaffer, and the officer who observed the highspeed chase, Trooper Miller. *See Woodward v. State*, 123 So. 3d 989 (Ala. Crim. App. 2011) (finding dash camera videotape authenticated by officers testifying to the reliability and trustworthiness of the video recording process in the video system of the patrol car)*; Commonwealth v. McKellick*, 24 A.3d 982 (Pa. 2011) (finding dash camera videotape authenticated by officer responsible for maintaining videotapes and officer who observed arrest of defendant).

### I. Comments by the Prosecutor During Closing Arguments

Mr. Wyche further contends that he is entitled to a new trial because the prosecutor made inflammatory comments during closing arguments that violated his right to a fair trial. The State argues that this issue was not preserved for review because Mr. Wyche

failed to make any objections during closing arguments. The record supports the State's contention.

This Court has held that "[a] judgment of conviction will not be reversed because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. pt. 5, *State v. Ocheltree*, 170 W. Va. 68, 289 S.E.2d 742 (1982). In *State v. Adkins*, 209 W. Va. 212, 544 S.E.2d 914 (2001), we succinctly addressed counsel's responsibility when it is believed that the prosecutor made improper comments to the jury:

> The rule in West Virginia has long been that "[i]f either the prosecutor or defense counsel believes the other has made improper remarks to the jury, a timely objection should be made coupled with a request to the court to instruct the jury to disregard the remarks." Syl. pt. 5, in part, *State v. Grubbs*, 178 W. Va. 811, 364 S.E.2d 824 (1987). This Court has also long held that "[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Syl. pt. 6, *Yuncke v. Welker*, 128 W. Va. 299, 36 S.E.2d 410 (1945).

*Adkins*, 209 W. Va. at 215, 544 S.E.2d at 917. Because of these well-settled legal principles, we deem this issue waived for appellate review purposes for failure to object at the trial.[28]

---

[28]In our review of the prosecutor's comments that are alleged to be improper, we do not believe the issue to be of such magnitude that we must invoke the plain error doctrine. *See* W. Va. R. Crim. P. 52(b). By its very nature, the plain error doctrine is

(continued...)

## J. Admission of Fingerprint Records During Recidivist Proceeding

The final issue raised by Mr. Wyche is that his fingerprint records from authorities in North Carolina were not authenticated properly. The State contends that the fingerprint records were authenticated under Rule 901(b)(7) and Rule 902(1) & (4) of the West Virginia Rules of Evidence.

We review a trial court's ruling admitting evidence for abuse of discretion. *See* Syl. pt. 4, *State v. Bowling*, 232 W. Va. 529, 753 S.E.2d 27 (2013). In order to authenticate a document under Rule 901(b)(7), there must be evidence that:

> (A) a document was recorded or filed in a public office as authorized by law; or
>
> (B) a purported public record or statement is from the office where items of this kind are kept.

Documents are self-authenticated if they properly comply with the requirements of Rule 902(1) or (4) as follows:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

---

[28](...continued) reserved for only the most egregious errors. In order "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). The comments relied upon by Mr. Wyche do not satisfy the elements of the plain error doctrine.

(1) *Domestic public documents under seal*–A document bearing a seal purporting to be that of the United States, or of any state, district, commonwealth, territory, or insular possession thereof, or the Panama Canal Zone, or the Trust Territory of the Pacific Islands, or of a political subdivision, department, officer, or agency thereof, and a signature purporting to be an attestation or execution.

. . . .

(4) *Certified copies of public records*–A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) of this rule or complying with any law of the United States or of this state.

During the trial and on appeal, the State relied upon the decision in *United States v. Ibarra*, 499 F. App'x 355 (5th Cir. 2012), to show that the fingerprint records were self-authenticated under Rule 902. In *Ibarra,* the defendant was convicted of unlawfully possessing a firearm as a previously convicted felon. In order to find that the defendant had been previously convicted of a felony, the federal prosecutor offered into evidence a certified copy of a state court judgment of conviction and sentence. Attached to the state judgment was a copy of a document bearing the same caption and date of that judgment and containing a full set of fingerprints of the defendant in the case. This evidence was presented through the testimony of a deputy clerk for the county clerk's office where the judgment and

49

fingerprint records were maintained.  On appeal, the defendant argued that the fingerprint

record was not properly authenticated.  The appellate court disagreed as follows:

> Based on the foregoing testimony, it is evident that the challenged fingerprint card is self-authenticating, and thus the district court did not abuse its discretion in admitting the card. *See* Fed. R. Evid. 902(4)(A); *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011).  Even if the fingerprint card arguably is not self-authenticating, the district court did not abuse its discretion in admitting the card into evidence, because it also qualifies as a "public record" admissible under Rule 901(b)(7) of the Federal Rules of Evidence.

*Ibarra*, 499 F. App'x at 356.  *See People v. Wiedemer*, 641 P.2d 289, 291 (Colo. App. 1981)

("The defendant argues that the documents received into evidence during the sentence

enhancement portion of the trial were improperly admitted because there was no testimony

by the custodian of the records.  The evidence included documents consisting of information,

final orders, and judgments in six prior felony counts as well as copies of Colorado State

Penitentiary fingerprint cards.  These documents, duly self-authenticated by a public seal,

were properly admitted without oral testimony."); *Collins v. State*, 521 N.E.2d 682, 685 (Ind.

1988) ("In appellant's case, both documents [fingerprint cards and judgments] were signed

and certified by the keeper of the records and each bore the seal of the Vanderburgh Superior

Court.  We find that the documents were self-authenticated, thus admissible under the

business records exception to the hearsay rule."); *Stewart v. State*, No. 09-09-00071-CR,

2009 WL 2617647, at *3 (Tex. App. Aug. 26, 2009) ("Pen packets that are certified by the

Texas Department of Criminal Justice are self-authenticated for purposes of Rules 901 and

902 of the Texas Rules of Evidence. Stewart's pen packets contained certifications from the records custodian for the Texas Department of Criminal Justice, and also contained copies of his photographs, the various criminal judgments rendered against him, and his fingerprints.").

In the instant case, the State presented certified copies of Mr. Wyche's prior criminal judgments from North Carolina, along with attached fingerprint cards. These documents had raised seals indicating that they were certified to be exact copies. The State presented a fingerprint expert who testified that the fingerprints on the fingerprint cards from North Carolina were the same as those of Mr. Wyche that were taken in conjunction with this case. The State also called Deputy Christian who testified that he requested Mr. Wyche's criminal record from North Carolina and that he received the same directly. Mr. Wyche objected to the admission of the fingerprint records only.

In this appeal, Mr. Wyche contends, without any authority, that fingerprint cards are not self-authenticating under Rule 902 and are not business records under Rule 901(b)(7). For the reasons set out in *Ibarra*, and the other authorities cited above, we reject Mr. Wyche's contention and find that the fingerprint cards were properly authenticated and admitted. We have recognized that, as a general principle, court documents which are certified by their custodian constitute "self[-]authenticating documents under the West

51

Virginia Rules of Evidence[.]" *State v. McCraine*, 214 W. Va. 188, 197, 588 S.E.2d 177, 186 (2003), *overruled on other grounds*, *State v. Herbert*, 234 W. Va. 576, 767 S.E.2d 471 (2014).

## IV.

## CONCLUSION

Based upon the foregoing analysis, we affirm the judgment against Mr. Boyd in Case No. 15-0878, and affirm the judgment against Mr. Wyche in Case No. 15-0894.

Affirmed.