# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.) No. 21-0388** (Berkeley County CC-02-2019-F-177)

**Terry G.,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Terry G., by counsel Patrick Kratovil, appeals the April 14, 2021, order of the Circuit Court of Berkeley County sentencing petitioner to an aggregate indeterminate twenty-one-to-fifty-year term of incarceration for his convictions of second-degree sexual assault; third-degree sexual assault; and sexual abuse by a parent, guardian, custodian or person in position of trust. The State of West Virginia, by counsel Patrick Morrisey and Lara K. Bissett, filed a response in support of the circuit court's order.[1]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In May of 2019, petitioner was indicted on one count of second-degree sexual assault; one count of third-degree sexual assault; and one count of sexual abuse by a parent, guardian,

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

custodian, or person in position of trust, all related to alleged acts he performed on then-twelve-year-old K.C. Prior to trial, the parties agreed, and the circuit court so ordered, to call fifty potential jurors for voir dire due to petitioner's concerns that the subject matter of the charges would cause an extraordinary number of juror disqualifications.

Jury selection began on January 20, 2021, and all fifty potential jurors appeared. At the conclusion of voir dire, petitioner noted the homogeneity of the jury:

> [Defense counsel]: The only thing I would want to vouch for the record is the racial issue, given that [petitioner] is an African American. We have only had one [African American] that appeared on the entire panel, and she was the last candidate.
>
> The Court: That's the luck of the draw, I'm afraid. Well, I mean, how would I fix that then? . . . I guess the question I'm looking for here today, what would you have me do?
>
> [Defense counsel]: Your Honor, I don't have a remedy at this time. I just wanted to make sure that we secured the objection.

The circuit court noted petitioner's objection to the jury's racial makeup.

The State presented testimony from five witnesses. The victim, K.C., testified that she was in bed asleep when petitioner, her mother's live-in boyfriend, entered her room around 2:00 a.m. and began rubbing her thighs. She explained that petitioner left and then returned after a few minutes and began rubbing her inner thighs. K.C. testified that petitioner then pulled her underwear to the side and licked her vagina. K.C. stated that she heard her mother move in another room, and petitioner shushed the child. Petitioner then made a vulgar statement to K.C. and left the room. K.C. explained that she got out of bed and washed her vagina with a washcloth because "it felt weird and stuff." She left the washcloth "balled up" on the bathroom sink counter. In the morning, K.C.'s mother, S.C., woke the child for school, and she immediately told S.C. what had occurred. S.C. drove K.C. to the hospital for a medical examination. After the examination, K.C. returned to her home with law enforcement to identify the washcloth. K.C. found the washcloth "folded," rather than balled up as she left it. Law enforcement collected the washcloth for DNA testing.

S.C. testified that petitioner was her live-in boyfriend. She remembered that petitioner was drinking alcohol the night before K.C. disclosed the sexual abuse. S.C. further testified that when she woke K.C. the next morning, K.C. informed S.C. what had occurred. When S.C. was asked about K.C.'s truthfulness, she stated, "I know when she's not lying and when she's lying." S.C. recalled seeing the washcloth balled up on the bathroom sink the morning that K.C. disclosed what had occurred and K.C. informing her that she used it to clean herself. S.C. further testified that she briefly confronted petitioner regarding the allegations, which he denied. Then, S.C. took K.C. to the hospital for an examination. Finally, S.C. testified that she had not told any friends that she was "looking to end the relationship" with petitioner prior to the allegations of abuse.

The State called Officer Brittany Conner of the Martinsburg City Police Department, who testified that she met with K.C., and the child disclosed the same complaint to her. Officer Conner went with K.C. to her home to collect the washcloth and heard K.C.'s comment that the washcloth was not how she left it the night before. Officer Conner collected the washcloth for DNA testing. A Sexual Assault Nurse Examiner ("SANE nurse") testified that she performed a "head-to-toe assessment" of K.C. but found no indication of trauma. She explained that the lack of trauma was expected based on K.C.'s statement. The SANE nurse testified that K.C.'s actions and disclosures were "consistent, especially the way she presented and was acting. She was very anxious and nervous." The SANE nurse also collected swabs from K.C.'s pubic area and vaginal area and collected the child's underwear, as K.C. stated that they were the same undergarments worn following the assault. Notably, both witnesses (Officer Conner and the SANE nurse) reported K.C.'s initial disclosures to them, which matched the child's testimony.

Finally, the State called a West Virginia State Police lab forensic scientist, who performed the DNA analysis on the washcloth, swabs collected by the SANE nurse, and K.C.'s undergarments. The forensic scientist explained that due to high amount of female DNA in the samples compared to the low amount of male DNA, he used "Y-STR" testing. According to the forensic scientist, this type of testing "only focuses on the result from the 'Y' chromosome," which is specific to human males. Twenty-three specific points, or "loci", on petitioner's "Y" chromosome were identified and then compared to the male DNA found in the samples. The forensic scientist testified that K.C.'s undergarments and vaginal swabs indicated a "single male contributor" of DNA and the DNA found was "consistent with the [DNA] profile" of petitioner. The forensic scientist further explained that the test results "could not exclude" petitioner or any of petitioner's male relatives, but that the results could exclude other unrelated males. The forensic scientist further testified that K.C.'s pubic swab and the washcloth did not contain sufficient male DNA for testing purposes.

Petitioner called three witnesses and testified on his own behalf. First, petitioner called T.K., who was petitioner's first cousin and S.C.'s co-worker. T.K. testified that S.C. intended to end her relationship with petitioner but "didn't know how to break up" with him. Petitioner's sister testified that she observed an interaction between petitioner and K.C. following the report of sexual abuse. She explained that petitioner went to the family home to collect some belongings, and K.C. waved at and greeted petitioner. Petitioner's former girlfriend testified that she was also present when petitioner went to the family home to retrieve belongings, and she observed K.C. acting "normal" with no apparent attempt to evade petitioner.

Finally, petitioner denied the allegations against him. He testified that he and K.C. had "issues" and that she would not listen to his directions. Petitioner testified that he did the laundry in the home and would wash his face nightly with the washcloth that K.C. identified as the washcloth she used the night of the assault. Petitioner also asserted that law enforcement never questioned him about the assault. On cross-examination, the State confronted petitioner with a body cam video of his arrest to refresh his recollection on whether the officer questioned him regarding the allegations. Petitioner then testified that the law enforcement officer informed petitioner of the charges and asked, "[Is there] [a]nything you want to talk to me about?" Petitioner then asked for an attorney, and the questioning ceased. Following petitioner's testimony, the defense rested. The

State presented no additional evidence in rebuttal. After deliberating, the jury found petitioner guilty of all three counts in the indictment January 21, 2021.

Petitioner filed a motion for a new trial, which the circuit court heard in March of 2021. Petitioner argued that the evidence presented at trial was insufficient to sustain a conviction and that the racial homogeneity of the jury was prejudicial. The circuit court denied petitioner's motion and then proceeded to sentencing. Petitioner called witnesses in support of a lenient sentence and exercised his right to allocution. The State argued in support of consecutive sentences of incarceration. Ultimately, by order entered on April 14, 2021, the circuit court sentenced petitioner to the statutory sentences for the crimes for which he was convicted and ordered that those sentences run consecutively. Petitioner's aggregate sentence is twenty-one-to-fifty-years of incarceration. Further, the court ordered petitioner to register as a sex offender for life and submit to thirty years of extended supervised release following his incarceration. Petitioner now appeals that order.

On appeal, petitioner first argues that the circuit court violated his right to an impartial jury under the United States and West Virginia Constitutions. According to petitioner, the circuit court should have sua sponte declared a mistrial and empaneled a new jury upon realizing that at most two of the fifty potential jurors were African American and that only one of those jurors was empaneled to serve on the jury.[2] Notably, petitioner cites to no case law that would sustain such an assertion.

As we have previously stated, "[w]e review jury selection under *Batson v. Kentucky*, 476 U.S. 79 ... (1986), *de novo*, but we review underlying factual findings for clear error. We review the trial court's ultimate disposition for abuse of discretion." Syl. Pt. 7, in part, *State v. Boyd*, 238 W. Va. 420, 796 S.E.2d 207 (2007). However, we have also held that, "[u]pon review, this Court will afford great weight to a trial court's findings as to whether a peremptory strike was used to advance racial or sexual discrimination." Syl. Pt. 4, *Parham v. Horace Mann Ins. Co.*, 200 W. Va. 609, 611, 490 S.E.2d 696, 698 (1997). In addressing petitioner's contentions, we must also consider our holdings in Syllabus Points 1 and 2 of *State v. Marrs*, 180 W. Va. 693, 379 S.E.2d 497 (1989).[3]

---

[2]The prosecutor stated on the record that there may have been one other individual "of minority descent" in the jury venire, other than the individual who was selected for the jury.

[3]Syllabus Points 1 and 2 of *State v. Marrs* provide

> 1. "It is a violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution for a member of a cognizable racial group to be tried on criminal charges by a jury from which members of his race have been purposely excluded." Syllabus point 1, *State v. Marrs,* 180 W.Va. 693, 379 S.E.2d 497 (1989).

(continued . . .)

Petitioner's argument on appeal relies on *Batson*. However, by petitioner's own admission "there [were] no apparent intentional actions by the prosecut[ion] to strike African American jurors" during jury selection. Indeed, in *Marrs*, we held that a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution occurs when members of a cognizable racial group are "purposefully excluded" from the jury. Syllabus point 1, *State v. Marrs,* 180 W.Va. 693, 379 S.E.2d 497 (1989). Here, petitioner identifies no evidence that the State purposefully excluded members of petitioner's race, and we find he is entitled to no relief on these grounds.

Petitioner next argues that the circuit court erred by denying his motion for a new trial based on the sufficiency of the evidence. He argues the State's witnesses were not credible and were directly contradicted by his witnesses. Petitioner also argues that K.C. did not express any fear or intimidation by petitioner and that there was no evidence presented to satisfy the "forcible compulsion" element of second-degree sexual assault. Upon our review of the evidence, we find petitioner is entitled to no relief.

> "'[A]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.' Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976)." Syllabus point 1, *Andrews v. Reynolds Memorial Hospital, Inc.,* 201 W.Va. 624, 499 S.E.2d 846 (1997).

Syl. Pt. 1, *State v. Vance,* 207 W.Va. 640, 535 S.E.2d 484 (2000). Further,

> [i]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit

---

2. "To establish a prima facie case for a violation of equal protection due to racial discrimination in the use of peremptory jury challenges by the State, 'the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venireman from the petit jury on account of their race.' [Citations omitted.] *Batson v. Kentucky,* 476 U.S. 79 at 96, 106 S.Ct. 1712 at 1722, 90 L.Ed.2d 69 (1986)." Syllabus point 2, *State v. Marrs,* 180 W.Va. 693, 379 S.E.2d 497 (1989).

court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*Id.*, Syl. Pt. 3. This Court examines issues pertaining to the sufficiency of the evidence challenges under the following standards of review:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

> . . .

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

Syl. Pt. 1 and Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

Here, the jury heard testimony from K.C. that petitioner entered her room, alone, at 2 a.m. and began to massage her legs. The evidence showed that petitioner left the room for a "short time" and then returned, began massaging K.C.'s inner thighs, and then performed oral sex on her. According to K.C., petitioner stopped and shushed the child after hearing S.C. move in a nearby room. Petitioner then made a vulgar remark to K.C. and left the room. K.C. was consistent in her allegations; S.C., the SANE nurse, and Officer Conner all stated that K.C. made a similar disclosure to them. Further, the jury heard that DNA consistent with petitioner's DNA was found in K.C.'s undergarments and inside the child's vagina. It is clear to this Court that there was sufficient evidence that petitioner sexually intruded upon K.C. Further, second-degree sexual assault, as defined in West Virginia Code § 61-8B-4(a)(1), requires a person to "engage[] in sexual intercourse or intrusion with another person without the person's consent, and the lack of consent results from forcible compulsion." Additionally, forcible compulsion can arise from three separate scenarios, one of which West Virginia Code § 61-8B-1(1)(c) defines as "[f]ear by a person under sixteen years of age caused by intimidation, expressed or implied, by another person who is at least four years older than the victim." Viewing the evidence in the light most favorable to the prosecution, the jury could reasonably infer that young K.C. was afraid of petitioner, who was an

intruder in her room in the middle of the night, such that forcible compulsion was proven. Finally, to the extent that petitioner argues that certain witnesses were more or less credible than others, it bears repeating that "[c]redbility determinations are for a jury and not an appellate court." *Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part. The jury weighed the testimony of the witnesses and rendered their verdict. Upon our review of the evidence in its entirety, we find that the jury's verdict is sufficiently supported and find no error in the circuit court's denial of petitioner's motion for a new trial.

For the foregoing reasons, we find no error in the circuit court's April 14, 2021, order.

Affirmed.

**ISSUED**: August 31, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn